is not a crime of violence under 16a. Good morning, your honors. Of course, Judge. Thank you, Judge. Good morning from Mr. Callahan and Andrew Frisch. Bond on petitions should be limited, but this is an extreme case. I want to start by pointing out what the government said about the $96 million on the day of Callahan's guilty plea. This is an exhibit before the court and also in district court. It's one of the government's press releases about Mr. Callahan's guilty plea. And it says, earlier today, Callahan pleaded guilty to operating a $96 million Ponzi scheme. And then a little bit further down, it says, when sentenced, he faces up to so many years in prison and the payment of approximately $96 million in restitution. So if paragraph 22 of the indictment, paragraph 39 of the PSR, the letter to Judge Spat in April of 2014, just a few weeks before the guilty plea, didn't make clear that the value of the fraud, absent credits, was $96 million and not a penny more, the press released their contemporaneous statement that day did it. So, in these cases, their client is actually in a better position than it was previously. By using the $19.7 million, the die-by money was lowered from $235 to $239. I couldn't disagree more, Judge Kattman. It's a question of reasonable expectation. It's a question of looking at the facts and determining what the party's expectations were. This is Mazel. This is Wilson. The parties had a very different view as to what this crime was. The government thinks it's a Madoff-style Ponzi scheme and they're entitled to that view. Callahan believes he lied about the panoramic view and his familial relationship with Manson because they thought it was a good investment and they wanted to do it. Isn't there more of a problem? We have to look at what's changed in the community. Let me answer that question. I want to come back to Your Honor's earlier question as well. I want to tie that up. When the Court dismissed the direct appeal, on surface, you could have assumed or the panel could have assumed, well, we don't see why there's a breach here. Counsel didn't raise a breach. There's not enough of a record. And whether we agree with that or not, it's a reasonable way of looking at the record as it stood at that time. Now we know a lot more that's off the record that we've advanced. We know that there's Callahan's declaration and the associated emails with counsel about what he believed he was pleading guilty to and what he said to counsel at sentencing, which is the government is conflating two separate transactions. That's a quote. They've shifted the entire debate of loss on this question. And there was no strategy. Defense counsel essentially said, I've skimmed the brief. Let's not do anything. Let's just be done. Let's not annoy Judge Spad. He didn't understand and appreciate. He couldn't have. This case is too complicated. In 36 hours, that wasn't the same lawyer at the plea. That's one thing. The spreadsheet. The spreadsheet that we didn't get until earlier this year enabled us for the first time to understand the government's math and to analyze it and to understand where the $140 million came from. What's the difference between the 140 and the 118? And to see that you could allocate credits. We don't think Callahan's entitled to all the credits. The spreadsheet enabled us to allocate credits to the allegations of the indictment. There's the Mazar's work, which is an exhibit below, and I think an exhibit in this court, but certainly it's part of the record. The declaration of the expert Florio. I want to come back to what Your Honor said, because the indictment said it's $96 million. Everything. Indictment, pre-sentence report, press releases. Let me stop you there just for one second. I believe that when you were talking about the $96 million at the time of the plea agreement, people were talking about an intended loss, and that was the way it was characterized. What was in the mind of the, what did the defendant intend as a result of this, the loss from his intentions? And that is very different from an actual loss calculation, which is a different calculation altogether. And I think that one of the problems in this case is those two concepts have been confused. In deciding that at the point that the contemplated range, the guideline range, was going to be the 50 to 100 million, then the amount of the intended loss was well within that range. But then the judge, and this goes to what Judge Katzmann was saying, when it came to sentence, the judge didn't look at an intended loss anymore. He was looking at, well, let's look at what the actual loss was, because some of these people were compensated. And so that's how, so then he went into a totally different calculation. He looked at the overall outlays of people in favor of this, of the defendant's actions, and then looked at offsets. So they seem to me different. Roberts. Your Honor, the statutes that are the commentary to the guideline that talk about these credits, the one that talks about collateral, the one that talks about value before the crime is detected, both are headed. The heading of that talks about loss. It doesn't talk about intended or actual loss. What I'm wanting you to know is what was in the mind of people when they entered into the plea agreement and also at the sentence in terms of whether there was an intended loss or a possible loss at a larger level. That would factor into the determination of what the range would be. But then a further determination, you know, at the time of sentence when all this information was made available, which is at a different time than the plea agreement. The $96 million was not, whether it's intent or actual, the $96 million was not an arbitrary number that they could fill in later. It was the value of the fraud, intent or actual. And it was understood that it did not include credits against loss. It couldn't have. The panoramic view, which was estimated to be worth at the time $52 to $88 million, had not yet been sold. We didn't know the — Callahan's records hadn't been seized. Were you entitled to credits? Yes, absolutely. And they don't argue to the contrary. In fact, if you look at their sentencing letter of September 2017, they say here are the credits of $120 million, which we're putting forth for guideline purposes. That's their language. The panoramic view was — But the client signed the plea agreement. Who represented him at the plea agreement? And wasn't there a determination of what the offsets were going to be at that time? No, absolutely not. They couldn't have. I mean, or some concept of it. Yes. And that's in Callahan's declaration. And there's no competing declaration of any of the defense lawyers in this case. This case has been fully briefed. And Your Honor has the government's responses in exhibit to my papers to the response to the petition. There's no competing affidavit from any of the defense lawyers below refuting Callahan, which is, it appears to me, self-evident from the record, even from Judge Spatt talking about the panoramic view. There are going to be credits. Government concedes that. There's going to be credits for the panoramic view. There's going to be credits for redemptions and value. What does the $96 million represent, then? Does it represent loss before credits? Does it represent loss before credits? We know it — I didn't mean to interrupt, Your Honor. What does it represent? It represented loss before credits. We know that. It's in paragraph 39 of the pre-sentence report. It says the $96 million is the amount inappropriately used. The press release talks about the need for restitution of $96 million at sentencing. The indictment talks about $96 million, the fraud. Before, anyone could have known what the value of the credits were, which didn't happen until closer to sentencing. The $96 million, whether it's intent or actual, was their number, the number they choose, which everyone understood was before credits, which there would be. And Judge Spatt, three weeks before the plea, said the panoramic view is being marketed for the benefit of victims. I believe it's worth $52 to $88 million. I think the issue was whether it was going to be sold at a particular option at that time. Callahan did not have the — The client was willing to plead guilty based upon a $50 to $100 million range at the time, that was calculated at the time, understanding that there would be credits and it might well be below that range. That's right. Exactly. And so what happened, Judge Walker, is that instead of starting with the $96 million, which he understood — whether or not he understood, and I don't think anyone did on the defense side, what the $96 million actually represented, except that it was lost. In other words, how they calculated the loss, we couldn't say. But we knew it was lost, absent credits. He had a reasonable expectation to believe that once we see the credits, that number is going to be below. He did not have the ability at the time of plea, no defendant does, to say to the government, listen, you've got to calculate credits. You've got to put that in and reflect the plea agreement. What he pled guilty to, what he agreed to, Judge Walker, was that $96 million was the value of the loss that would then be adjusted at sentencing for credits. What happened in this case is that for the first time, two days before sentencing, the government increased the $96 million fraud loss. They said it's not — 96 is what we said in the press release, in the indictment, to the probation department, for the PSR, it's in your plea agreement. We're changing it to $140 million. The question is the reasonable expectation of the parties, but certainly Callahan, when he agreed to that $96 million, it was a fixed number that related to the value of the loss. It wasn't a number that they could change to accommodate credits later. That was the expectation of the parties. And there was nothing from the government with regard to the defense lawyers in this case at plea or at sentencing to refute what his understanding was. And this is one more point, and I know I'm over time, but if I can make this one more important point. The indictment acknowledged innocent conduct, non-criminal conduct, conduct that was above and beyond the $96 million. We know that's so, at least because the number of total raised at the time was represented to be $118 million. Later it became $140 million. That delta includes innocent conduct. He could not have had a reasonable expectation. He could not have had a reasonable expectation that that $96 million could be increased after he pled guilty to include the value of conduct which the government in the indictment said was not fraudulently intended and was not criminal conduct. It's not enough to say, well, we did the math and we come out to below $96 million. He was entitled in his mind to have a reasonable expectation that that was the value of the loss, and in his mind that he knew, say, all the panoramic view, value of redemptions, that number would come lower and reflect the crime that he really committed. He did not have the bargaining power at the time of the plea agreement, no defendant does, to say, listen, I disagree with you as to how you've got to put credits in. You've got to let me plead guilty to something else. But at least mention credits. At least mention credits. They set a base offense level at 7 and then a loss amount of more than $50 million at 24. That's the end of it in the plea agreement. That is correct. That's their plea agreement. We can't force them. Look, maybe the defense lawyer at the plea agreement should have said, Judge, we haven't calculated credits yet, but I think that was self-evident that they hadn't calculated credits. It's a $96 million fraud loss before credits. We could not force. And even if he said that, even if defense lawyer at the plea said, you know, there's credits coming, the government wouldn't be bound by that statement. They didn't have to agree to it. They certainly didn't have to put it in the plea agreement. Whatever happened at the plea agreement set the benchmark of 327 months. It set the plea, assuming they didn't breach the agreement, assuming they didn't violate the reasonable expectation of the parties, Judge Walker, that the $96 million was the fraud loss. There's generally speaking two parts to calculating loss. There's fixing the loss, which is typically what you see almost always what you see in a plea agreement. That's the value of the loss. And at some point, typically before sentencing, I'm sure there are other cases and exceptions, that's where you talk about credits. When Cali as a matter of fact, let's take a step back for a second. As a matter of fact, this is not a $96 million Ponzi scheme. This is a case where the sale of the panoramic view by their own admission in their September 2017 says they got back $40.3 million when only $38 million was diverted to it. This is a case that produced a gain as a matter of fact. And what the government did is increase the value of loss just before sentencing from the $96 million that everyone understood it was to include non-criminal conduct so they could back into a number that was below the guideline range in the plea agreement. Under Mazzell, under Wilson, you can't do that. Under all the other cases that talk about breach of the plea agreement, you cannot do that. May it please the Court. Good morning, Your Honor. My name, or Your Honors, my name is Chris Cafferone. I'm Assistant United States Attorney in the Eastern District of New York. I represent the United States in this matter. I just want to start with the posture that we're in now. We're here to decide. The Court's here to decide whether the District Court should have granted bail to a defendant whose conviction, who's been convicted, whose conviction has been affirmed, and he's serving a sentence of 12 years. He's a year and a half into it. That's what the Court's here to decide. And I think when you look at this Court's precedent, statements like this is a case where a defendant can both show a high probability of success, where defects are readily apparent from the petition that a District Court can predict with confidence that it's going to succeed and that there will be a victory. And that there's I'm not, Your Honor. I'm just, what I want to bring us back to is what we're here to decide now. We're not here to decide the merits today. We're, exactly. That's going to be decided at the District Court level, and then it will be for a subsequent panel to decide. That's not what's being decided now. What's being decided now is the extraordinary relief that this defendant is seeking. And the extraordinary relief is you're a year and a half into a 12-year sentence for a defendant who's been convicted, who's not any different than any other habeas defendant serving a sentence, having his conviction affirmed on appeal. Whether he's entitled to this extraordinary relief. And I believe, you know, in our position, the government's position is that the District Court correctly concluded that he didn't meet either of the standards set forth by this Court. First, he's got to show the high probability of success. The District Court presiding over the case for approximately six years, having seen firsthand the observation, observing firsthand the effectiveness of defense counsel. These were extremely talented, intelligent, experienced criminal defense attorneys that were retained by Mr. Callahan, both at sentencing and at the police stage. He also, Judge Spatz, was also able to observe the government's conduct throughout and its good faith throughout all of these proceedings. And seeing that the government advocated for a sentence that was 70 or 84 months less than at the police stage. This Court is here to determine whether or not that determination was the correct one. And I submit that it was. When you look at the second prong also, you've got extraordinary circumstances that the defendant has to demonstrate, which he utterly fails to do. This Court made it clear that continued confinement is not a sufficient basis to find extraordinary circumstances. And there's no reason to disturb that holding. We're bound by that precedent. The defendant just cannot satisfy either of the two prongs. And so taking us there, there will be a time where the merits will be decided by the district court and then Mr. Callahan can take it up on appeal where he can raise these issues. This is just not the appropriate forum. And for those reasons, if the Court doesn't have any additional questions, we'll rest on our papers. Thank you. Under Mizzell, the decisive in other cases, and this actually may be language from a case called Riggi, R-I-G-G-I. It may not actually be from Mizzell, but it's Second Circuit, a case called Riggi. The decisive consideration in invalidating a waiver is whether the sentence was reached in a manner that the plea agreement did not anticipate. It's not a question of whether down the line a calculation can be done that results in a number that fits in with the range. It's whether, according to the Court, the sentence was reached in a manner that the plea agreement did not anticipate. If the plea agreement has in it, supported by all the other documents, all the press releases and the pre-sentence report and everything else, that the fraud loss was $96 million, and a defendant believes he's entitled to credits, which I believe under the law he was, and they haven't denied that, he's entitled reasonably to expect the government to stand by its representation, determine its plea agreement, that the value of the fraud is $96 million. Not 118, not 140. I believe that what the government did here is use that number and use the 327, to which either Judge Katzman or Judge Walker made reference to, Katzman made reference to, as a ceiling to recalculate and violate the reasonable expectations of Callahan and the parties. The reason we're here, although this is the unusual posture where the case isn't factfully brief, the reason we're talking about the merits is because on a bond for a petition it's the dispositive inquiry, how substantial, how likely is, how likely is. If this was a different kind of case and there was DNA and it showed the defendant was innocent, then one could imagine that if there was a dispute over the DNA or something of that sort, one could see that. This is a habeas proceeding and most habeas proceedings proceed with the defendant being incarcerated until there's a determination. Can I make one point? Why is that a problem? I know my time is up and I appreciate your indulgence of me, I really do. But if I want to make one point on this, because I think this is a practical effect and I think it's very important. People like Callahan don't have any bargaining position. Someone like Callahan knows he committed a crime, a serious crime, but he also knows he didn't commit, in his view, he's entitled to it, a Madoff-style Ponzi scheme. He's not Bernie Madoff. There's real investments. There's $120 million of value. He can't force, he doesn't want to go to trial. He wants to plead guilty and accept responsibility for what he did. He also wants to get sentenced for what he believes that he did and not get sentenced based on the government's, what he believes is a more exaggerated view. So he looks at their plea agreement. And the plea agreement says $96 million fraud loss. And he knows, from Judge Spad alone, that this panoramic view is going to be sold for as much as $88 million. He doesn't know how the mortgages are going to work out. He doesn't know precisely. But he relies on that representation, not because it's an arbitrary number stamped on a shell that the government could say, well, we'll make it less, we'll make it $140, we'll back into it. It's the fraud loss that he believed was the accurate number from which he then believed he would get credits. And as it turns out, the credits are in excess of $96 million. That reflects the crime that he committed. And I believe that he's sitting in jail right now for a crime that he did not commit, especially because under the government's analysis, they have put into the case with $140 million precisely the non-criminal conduct, the conduct which they say in their indictment, he did not fraudulently intend. That's where we are today, most respectfully. Thank you, Your Honor. I seek refuge in the Lord from the devil, and from the devil, and from the devil, and from the devil, and from the devil. I pledge allegiance to the flag of the United States of America, and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all. Thank you.